**DIXIE PLYWOOD COMPANY,**
Plaintiff,

v.

**S.S. FEDERAL LAKES, her engines, boilers, etc., et al., Defendants.**

No. CV474-38.

United States District Court,
S. D. Georgia,
Savannah Division.

March 28, 1975.

Fred S. Clark, Lee & Clark, Savannah, Ga., for plaintiff.

Ralph O. Bowden, III, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for first three defendants.

Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for Atlantic Terminals, Inc.

## ORDER AND OPINION

### CONCLUSIONS OF LAW AND FINDINGS OF FACT

LAWRENCE, Chief Judge.

### I

This action is brought under the Carriage of Goods by Sea Act by Dixie Plywood Company of Houston, Inc. Plaintiff seeks recovery of damages to a shipment of prefinished plywood panelling aboard the M/S "Federal Lakes" enroute from Korea to Savannah in 1973.

Apparently the damage resulted from the shifting of the cargo due to heavy weather. However, cargo damage is also blamed on the stevedore (South Atlantic Terminals, Inc.) because of alleged rough handling in the course of discharge at Savannah.[1]

---

1. The vessel and the stevedore have stipulated as to their respective percentages of responsibility for damages to the cargo.

The bill of lading covering the 94 crates of plywood was a clean one without exceptions as to good order of the shipment on receipt aboard the "Federal Lakes". The shipper was Sung Chang Enterprise Co., Ltd.; the consignee was Texas Commerce Bank, and the order-notify party at Savannah was Dixie Plywood Company of Houston, Inc.

It is admitted by defendants that damage to the shipment (or part thereof) existed on discharge at Savannah. The case was tried on February 24, 1975. The principal questions before the Court are the extent of damage to the plywood and the proper measure of such damages.

## II

Dixie Plywood of Houston contends that all of the crates of plywood were damaged to the extent that the cargo was worthless for its own purposes or those of Dixie of Savannah. Plaintiff alleges that the damage to the shipment amounted to $40,305.[2]

The damages as originally computed by plaintiff appear to be based on a value of $97.17 per thousand square feet (32 square feet per sheet) or $3.11 per sheet (150 sheets per crate). The General Manager of Dixie Plywood of Houston testified that the estimate was based on actual cost plus a 15% mark-up by its vendee, Dixie Plywood of Savannah, Inc. plus the latter's ordinary 25% mark-up at retail. Dep. of J. E. Stevens, p. 5. From the value of the shipment as so computed, the amount of $21,551.11 representing proceeds of the salvage was deducted.

Another witness for the plaintiff, Kirby Beam, Vice-President and General Manager of Guerry Lumber Company, testified that in the Savannah area the retail value of the plywood was $4.98 per sheet or $105.63 per thousand square feet. The wholesale price that Guerry Lumber Company was paying amounted to $3.79 per sheet.

The defendants contend that 32 of the 94 crates comprising the cargo were not damaged and were in sound condition and should not have been sold as salvage. The undamaged crates represented the equivalent of two truckloads of plywood and same could have been sold by the Savannah wholesaler. Defendants argue that actual damage rather than market value at destination, as computed by plaintiff, is the proper measure of damage in the case.

## III

Dixie Plywood of Houston sells building materials to retail lumber yards in the Texas area. It has an international division which purchases plywood from foreign manufacturers and imports same for resale to eight wholesale warehouse companies on the east coast with which it has affiliation. Each of these Dixie Plywood concerns is a separate corporation and has separate stock ownership. Dixie Plywood of Savannah engages in the purchase, sale and distribution of building materials to retailers in the Savannah area. The plywood shipments imported from Korea belong to Dixie Plywood (Houston) until they are transferred by book entry to Dixie Plywood (Savannah) on arrival at destination. In the present case Dixie Plywood of Houston resold the plywood purchased from the foreign manufacturer to the Savannah corporation.[3] The profit to

2. It is noted that the claim of plaintiff made prior to litigation was in the amount of $30,270.40 and was based on a "landed cost" of $26,390 plus the duty of $3,880.40. See defendants' Exhibit #3.

3. The General Manager of Dixie Plywood of Houston, J. E. Stevens, testified on deposition that the entire shipment was specifical-

ly ordered for sale to Dixie Plywood of Savannah. (Dep., p. 32). However, another witness for plaintiff, W. L. Hamilton, General Manager of Dixie Plywood of Savannah, testified that 6,000 of 14,100 sheets of plywood were destined for Dixie Plywood of Atlanta, Inc.

the Houston company on the resale to Dixie Plywood of Savannah of the plywood was $1,353 above landed cost, a figure based on a mark-up of $3.00 per sheet. Since Dixie of Houston disavows any control or ownership of the Savannah wholesaler, the resale price to the latter must be treated as an arms-length transaction between the two.

The stevedore and the shipowner compute the damage to the shipment of plywood as follows:

### SHIPOWNER

| | |
|---|---|
| Invoice cost of cargo | $19,401.60 |
| Plus freight | 3,825.22 |
| Plus duty | 3,880.40 |
| Landed cost | $27,107.22 |
| Less salvage | 21,551.11 |
| Loss | 5,556.11 |
| Plus profit or resale | 1,356.60 |
| | $ 6,912.71 |
| Plus salvage expense | 2,631.65 |
| | $ 9,544.36 |
| Less 25% of shipment representing sound cargo | 2,386.09 |
| Actual loss | $ 7,158.27 |

### STEVEDORE

| | |
|---|---|
| Invoice cost | $19,401.60 |
| Plus profit on resale | 1,353.00 |
| Plus freight | 3,825.22 |
| Plus duty | 3,880.40 |
| Plus salvage expense | 2,631.65 |
| Total | $31,091.87 |
| Less salvage | 21,551.11 |
| Loss | $ 9,540.76 |
| Less value of 32 sound crates | 3,153.23 |
| Actual loss | $ 6,387.53 |

## IV

Plaintiff claimed that there was damage to all of the 94 crates of plywood on outturn at Savannah. It consisted of chipped edges and ends with cutting, chaffing and indentation, split boards, boards missing or broken and top packaging broken and contents chaffed, cut or rubbed on the ends. The General Manager of Dixie Plywood of Savannah, W. L. Hamilton who inspected the cargo crate by crate, testified that none of the plywood was in saleable condition. He said that it was his experience that every time there is damage to a crate one may "almost bet" that there is damage to the plywood itself. According to J. E. Stevens who did not see the damaged cargo, Mr. Hamilton informed him that he had inspected same and that he did not feel that Dixie of Savannah could sell or use it.

The entire shipment of 94 crates was treated as damaged and no part of the cargo was accepted. It was sold by a South Carolina salvage company on bids for $21,551.11.

Harry E. Jennings, a marine surveyor who inspected the crates following discharge at Savannah, testified that 32 were in sound condition. Captain Jennings so informed a surveyor representing the interest of the underwriters. He was told that the Houston company had refused to take delivery of any part of the shipment.[4]

4. In several cases that have come before me in which cargo damage has been discovered upon delivery at the Georgia State Port in Savannah, consignees have refused acceptance of the delivery as a whole because there was damage to a considerable part. The entire shipment is sold as salvage. In the present case J. E. Stevens testified: "If you have a large shipment and you've got a half dozen or so good crates out of the thing, it really isn't worth it just to pull those out and then—it's best just to get— just let the whole thing go, because you're only going to get a few hundred pieces, and

■■ One injured by the negligent acts of another must exercise reasonable care in order to avoid loss and to minimize the resulting damage. To the extent that the damages are due to failure to exercise such care, there can be no recovery. See *Compagnie De Navigation, etc. v. Mondial United Corporation*, 316 F.2d 163, 171 (5th Cir.); *Santiago v. Sea-Lands Service, Inc.*, 366 F.Supp. 1309 (D., P.R.); *Emmco Insurance Company v. Wallenius Caribbean Line, S.A.*, 5 Cir., 492 F.2d 508, 514–515. The burden of proof as to failure by a shipper or cargo owner to mitigate the damage is cast on the shipowner. *Emmco Insurance Co., supra*, at 514. I will return to the subject of the damage to the plywood after surveying the law as to the appropriate measure of recovery applicable to this case.

### V

■ In the event of loss or damage to cargo, the carrier's liability is ordinarily measured by the difference between the market value at destination if the shipment had arrived in good condition and its market value as damaged. See *Holden v. S.S. Kendall Fish*, 395 F.2d 910 (5th Cir.); *Waterman S.S. Corporation v. United States Smelting, Refining & Mining Co.*, 155 F.2d 687, 694 (5th Cir.); *The Ansaldo San Giorgio I v. Rheinstrom Brothers Co.*, 294 U.S. 494, 55 S. Ct. 483, 79 L.Ed. 1016; *Encyclopaedia, Inc. v. SS Hong Kong Producer*, 422 F. 2d 7, 18 (2nd Cir.); *Atlantic Mutual Insurance Company v. Poseidon Schiffahrt, G.m.b.H.*, 313 F.2d 872 (7th Cir.), cert. den. 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53; *Daido Line v. Thomas P. Gonzalez Corporation*, 299 F.2d 669 (9th Cir.).

■ However, market value is only one method of ascertaining the loss to the shipper. It may be discarded for more accurate means if available. *Illinois Central Railroad Company v. Crail*,

281 U.S. 57, 64, 50 S.Ct. 180, 74 L.Ed. 699; *Reider v. Thompson*, 197 F.2d 158 (5th Cir.). The market value standard does not have to be applied where there is a better means of computing actual damage. *F. J. McCarty Company v. Southern Pacific Co.*, 428 F.2d 690 (9th Cir.); *Great Atlantic & Pacific Tea Company v. Atchison, Topeka and Santa Fe Railway Company*, 333 F.2d 705 (7th Cir.). Under COGSA, a carrier's liability is limited to "the amount of damage actually sustained". 46 U.S.C. § 1304(5). Fair market value and actual damage are equatable in a proper case. The Act looks to the economic realities of the loss rather than the contractual bargain. *Holden v. S.S. Kendall Fish, supra*, 395 F.2d 910, 912–913.

"The primary object in awarding damages is to indemnify plaintiff for the loss sustained by reason of the carrier's fault, and with respect to this issue plaintiff bears the burden of proof." *Interstate Steel Corporation v. S.S. "CRYSTAL GEM"*, 317 F.Supp. 112, 121 (S.D., N.Y.). "The assessment of damages in particular situations has called for the development of lesser rules, the use of common sense and the creation of exceptions, all to the end that the shipper whose property has been affected be made whole." *Santiago v. Sea-Lands Service, Inc., supra*, 366 F.Supp. at 1314.

■ The invoice cost of cargo may establish fair market value thereof in sound condition. *Emmco Insurance Company v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508 (5th Cir.); *Elia Salzman Tobacco Co. v. SS Mormacwind*, 371 F.2d 537, 539–540 (2nd Cir.); *Weirton Steel Co. v. Isbrandtsen-Moller Co.*, 126 F.2d 593, 594 (2nd Cir.). Where a consignee has contracted to resell the cargo after delivery at a higher price, it has been held that the measure of recovery of damages against the vessel is the difference between the resale price and the fair market value of the

it's more costly to haul less than a truck load . . . from the dock. It's more costly and trouble to handle than just—really, you're probably just better off just to let it go." Dep., p. 12–13.

shipment had it not been damaged in transit. *Samincorp v. S.S. Rivadeluna,* 276 F.Supp. 251, 257 (D., Del.).

## VI

■ General Manager Stevens of Dixie of Houston testified on deposition that at the time of delivery of the cargo in 1973 the plywood market was rising rapidly. Apparently the period involved coincided with a short supply of pulpwood and the removal of price controls. The proceeds of the salvage sale bears this out. The invoice cost, plus duty and freight amounted to $27,107.22. Despite presence of much damage, the plywood brought $21,551.11 or approximately 80% of the invoice-expense-profit value if delivered in good order. Mr. Stevens testified that the basis of value he used was "actual cost" [invoice price] plus a wholesale mark-up of 15% plus the customary retail mark-up of 25%. Dep., pp. 8–9.

However, plaintiff is apparently dissatisfied with that evaluation of its loss. Dixie of Houston would ignore invoice price. Kirby Beam, the General Manager of Guerry Lumber Company, a retailer, calculated market value on the existing retail price at Savannah—$4.98 per piece. That method would produce a value of the 94 crates of $70,218. There are 150 sheets per crate.

This Court finds that plaintiff is not entitled to recover on the basis of the retail price. Nor can value be increased by a wholesale mark-up of 15% when it had resold the plywood on a 5% profit over invoice cost. Plaintiff was not forced to purchase plywood at retail in order to comply with its commitments.

Under COGSA the measure of recovery for breach of a contract of affreightment is, as stated, the actual damage sustained. I conclude that the appropriate measure of damage in this case is the invoice price, plus freight, duty and the profit on resale to the wholesaler less the salvage value of the goods. If this method produces a valuation that is low in the light of the then prevailing plywood market, such is the plaintiff's own doing. It pre-sold the shipment to Dixie of Savannah at a mark-up of only 5%. To compute the loss to Dixie of Houston on any other basis would be to disregard the actual damage requirement of COGSA. It would make the plaintiff more than whole where the statute merely requires recompense.

## VII

As stated, the measure of damage to the cargo that will be applied is the invoice price, plus cost of transportation, import duties, and profit on resale less proceeds of the salvage sale. There is an additional factor. The damages so computed should be reduced by the amount by which plaintiff could have reasonably mitigated its loss. I recur to that subject.

Defendants contend that 32 crates of plywood were in good order at destination. There was no adequate inspection by plaintiff of their contents on outturn. Evidence was not presented at the trial as to the actual condition of the entire shipment when it was sold at salvage. Nor was there testimony as to what each category of damaged (or undamaged) plywood brought on the highest bid.

Mr. Phil Hamilton of Dixie of Savannah surmised that since the edges of the crates showed signs of rough handling, the plywood was damaged. A survey of the exterior of the crates by the shipowner's representative indicated no damage to the exterior of 32 crates. Captain Jennings surmised that damage to their contents was unlikely.

To mitigate damages requires a more adequate survey to determine the extent of the loss than was undertaken by the plaintiff. The amount brought by the cargo as salvage indicates that a substantial portion thereof was in good order when discharged. I realize that time, trouble and expense is involved in inspection and appraisal of damage to contents of crates. It is more conve-

nient to sell the entire cargo only as salvage than to dispose of the good order portion separately.

The gross salvage proceeds, exclusive of expenses, amounted to $21,551.11. The plywood in at least 36 crates was badly damaged. Obviously, most of the value as salvage is attributable to what was paid for the plywood in good order. A small portion only of the proceeds was necessarily derived from the recoopered crates. In fact, the sound and lesser damaged plywood could have brought a price materially above the invoice cost plus duty, freight and profit on resale. Clearly, the sound plywood lost nothing in actual value to plaintiff by its sale as salvage. Under such circumstances, defendants cannot contend that Dixie of Houston failed to mitigate its damages in not selling the sound part of the cargo by separate, private sale thereof.

I find that plaintiff's recovery is not reducible on the theory of failure to minimize its loss.

Expenses and commissions connected with the salvage totalled $2,631.-65. In the case of cargo damage, expenses "prudently incurred in mitigating the loss will be allowed as part of the damage". *Carver's Carriage by Sea* (8th ed.), Sec. 713; also 22 Am.Jur.2d, Damages § 169. *Cf. Schroeder Bros. Inc. et al. v. M/V Saturnia*, 1958 A.M.C. 1785, 1806 (S.D., N.Y.). The amount of expense is recoverable as part of the damages sustained by the plaintiff.

## VIII

Applying the standard adopted by this Court in measuring damages actually sustained, the loss to plaintiff is computed as follows:

| | |
|---|---|
| invoice cost | $19,401.60 |
| freight | 3,825.22 |
| duty | 3,880.40 |
| profit on resale | 1,356.60 |
| ($3 per M.) | $28,463.82 |

LESS gross salvage

| proceeds | $21,551.11 |
|---|---|
| | $ 6,912.71 |

PLUS salvage

| expense | $ 2,631.65 |
|---|---|
| Total Damages | $ 9,544.36 |

Judgment will be entered against the vessel, her owner and charterer in the amount of $9,544.36 with interest on the portion thereof representing cargo damage at 7% per annum from the date of discharge at Savannah, April 12, 1973.[5] The amount awarded for commission and expenses in connection with the salvage sale will bear interest at the same rate beginning with the time of payment thereof, July 3, 1973.

No evidence was presented in support of a finding against the stevedore and judgment is rendered in its favor. It is understood, however, that South Atlantic Terminals, Inc., in accordance with the stipulation between it and the other defendants, will pay an agreed percentage of the judgment or will reimburse the other defendants to that extent.

Judgment will be entered accordingly.

5. As to award of interest, see *American Smelting & Refining Co. v. Black Diamond Steamship Corp.*, 188 F.Supp. 790 (S.D., N.Y.) ; *Trans-Amazonica Iquitos, S.A. v. Georgia Steamship Co.*, 335 F.Supp. 935 (S.D., Ga.) ; 80 C.J.S. Shipping § 158.